for all the next case please. Three zero nine zero one zero nine. They're already having seen anything here. For here at all. You please report. Good morning, Mr Fielding. Good morning, your honor. We're here on an appeal from a jury verdict and a denial of post trial motions. Uh, medical malpractice case involving a negligent, according to the plaintiff, a negligent admission, uh, administration of a chemotherapy drug intravenously into the arm of a 75 year old woman, Marilyn Hardy, back about two years ago. The issues in this case are twofold. Number one, whether the court erred in denying first plaintiff's motion for directed verdict at the close of the defendant's case for failure to contrary to the plaintiff's experts opinions regarding what the standard of care was for a reasonable oncology nurse and the fact that the standard of care had been breached by Mr. Cordero. And also whether the court erred in failing to grade our motion for a new trial based on evidentiary errors, in particular with respect to 213 disclosures of expert opinions, first by them six days before trial, and then denying plaintiff the right to cross examine one of their controlled expert witnesses in this case and in other areas with respect to evidentiary rulings also. In this case, this was not a nursing clinical judgment case, as the defense wants you to believe in this situation. Here, we have established a prima facie case of medical negligence by a nurse. Number one, there was a duty of care. What's the duty of care? Not to injure the patient in the course of administering this chemotherapy drug, Adriamycin. Well, no, wait a minute. Nobody has a duty not to injure somebody. The duty is not to injure somebody as a result of your... Correct. So it's not strict liability. Well, I'm not... I do apologize, Your Honor. The negligence in this case is when there was a development of objective signs of an extravasation that the duty of care called for a reasonable oncology nurse practicing in this area to stop the IV administration and start protocols to remove that vesicant from the tissue area. My expert witness, Michelle Klutz, an experienced oncology nurse, testified that the standard of care for a reasonable oncology nurse, when confronted with objective signs of extravasation, namely redness at the injection site and complaints by the patient of burning, that the standard of care called for cessation of that administration of the drug. It also called for, if the patient said go on, for the nurse to warn the patient of the fact that if you continue on, you risk further damage. You risk the fact that this can continue to extravasate and spread into your tissue, causing burning. There is no contrary evidence as to that standard of care, and there is no contrary evidence to the breach of the standard of care. You've said that in your brief, and you've said it now, but it seems like if we look at the transcript, we see a dispute with regard to that standard of care. Well, Ms. Cordero testifies that, yes, I saw redness and I saw burning, but I didn't think it was bad enough to stop the procedure. I thought it was an irritant versus an extravasation. But she's the only disclosed expert witness that testified at trial for the defense on this issue. And when you testify in a medical malpractice case, you don't set the standard as to what your standard is. It's what the standard of care is for a reasonable practitioner in that question was never asked nor answered by the defendant in this case. Okay, I'm a little confused because I thought that she was asked a question about the oncology standards, and she said they don't say that. She did ask that. She did say that they did say that, that the redness and burning are objective signs of an extravasation. But she comes back and says, well, I didn't think that that means that I had to stop. But the only question put to her as to whether the standard of care was met in this case was that in Mr. Trinburn's direct examination in her case. And here's the question. In retrospect, without taking into account what we know the result of treatment was, but based on the facts and information available to you on February 23rd, 2007, that she had redness at the IV insertion site, that she had complaints of burning, and the subjective comments she made to you about how she was reacting to that pain, do you believe of that day, based on that information, that you violated your standard of care as an oncology nurse? No, I do not. That doesn't create an issue of fact. Because the question is improper. The question should have been, did you meet the standard of care applicable to a reasonable oncology nurse practicing in this area? That's what the case authority says. It's not whether she met her own personal standard of care as an oncology nurse. That's a subjective standard. Well, do you think that's what the question was really intended to convey, was her own personal thing, or they said as an oncology nurse? But let's still judge this. The question is defective because you have to ask it within the standard of care of a reasonable oncology nurse practicing in this area. Any objection to the form of that question? No. I don't have to make the defendant's case, so why would I object to an improperly formed question? But again, the evidence still, even if you were to give them the benefit of the doubt in this situation, is overwhelming in favor of the plaintiff or Ms. Hardy in this case. Mr. Fieber, I have a procedural question. We were not able to determine whether Ms. Cordero was ever actually tendered as an expert and accepted as an expert by the trial court. I don't know if he ever identified in the course of the trial that, but he did disclose as of 2-13, six days before trial, that he would be calling her as an expert witness, controlled expert witness. But I didn't ever remember in the record them just saying that she would be testifying as an expert to the jury or to the court. Is that not necessary for expert testimony? Well, I think that leads to some of the confusion in this case, and another reason for a new trial in this situation is because how are we tendering her, as an occurrence witness or as an expert witness in this situation? When she tendered, you just said she was tendered as an expert witness. On her own behalf, yes. But they also tended Teresa Ransky as a controlled expert witness in this case, and I was disallowed by the trial court from questioning her as to opinions and conclusions as an expert, and that's a violation of 2-13. When somebody is tendered as an expert, and I as the opposing party have the right to cross-examine them as an expert, and then I get these objections, no, we're tendering her only as an occurrence witness at trial. Isn't there a difference between disclosing and tendering? I mean, she was disclosed in the 2-13 as a controlled expert. Correct. Was she tendered as an expert? During the course of the trial? Yes. I can't say that she was. And that's why they asked the question about an escort hero, too. I can't say that she was, but I'm not aware of a case out there, Your Honor, that says that I am not a controlled expert witness on opinions and conclusions. Well, that was beyond the scope of the direct, though, wasn't it? No, because in the direct, we've asked her, what did you see? And she said, I saw redness, and we're going to fight about what the size was, but let's just say redness. And that she learned that she was going to be administering the I would start a new IV line. And I asked her, well, why would you do that? Well, because it's a known vesicant, correct? Yes. And you know that this vesicant drug can burn. Yes. Then I wanted to continue on to this and say the standard of care called for a reasonable oncology nurse and confronted with this to start a new IV. Did you ask that question? I did. I tried to, and I was stopped at that point. I looked at the record and didn't see that question asked. Did you actually ask the question? I think I did in my offer of proof. When we took it up to the side, I tried to go into this and go into the policies and procedures and say, look, these are the policies and procedures to be followed by a reasonable nurse. And that was my offer of proof My question is the other side when they called this person as a witness, they didn't ask for an opinion. They didn't ask any opinion. No, they did not. Okay. So it's their direct. They didn't ask any opinion witness questions. They asked occurrence questions. I agree with that. Then you cross examined. Correct. Okay. Now you want to turn the person from the occurrence and you want to slip into opinion in their case in chief, right? In cross examination when they didn't ask any opinion questions. Sure. I don't think that's if you've disclosed them as a 213 F or 213 F and G, I think they're fair game at trial. Now you're turning that in your case in chief, giving an opinion from the person that happens in all cases. Well, they asked opinions, but they didn't ask an opinion. Well, I think they do when they're saying the redness is only the size of the tip of the pencil and trying to infer to the jury that that's okay to have that size of redness. But she did testify that this is a situation where I told Cordero to start the idea over. And the logical result is I want to go forward and say, why did you tell her? Because the reasonable oncology nurse in that situation starts over. You don't need this to change. This is a burning, vesicant drug. In all fairness to Ms. Cordero, she says these are objective signs of both an irritant and extroversation. But she decided to say that when you have policies that they've admitted in evidence that say the objective signs of an extroversation are redness and burning, that you have five times during the course of the administration of the premeds and the aviomycin burning complaints fabrication. When you have a situation where a duty as a reasonable oncology nurse to stop that IV at that point. Did you indicate that Nurse Rashid was going to be one of your two virgin experts? No. I did not. Could you have called her as a rebuttal? Why would I call her as a rebuttal in that situation if the court has old be your witness at that point? Well, I could. I mean, I drew out of her the facts that I could as an occurrence witness, namely that she saw these things and she told Cordero that I'd start a new IV. But I wasn't going to be allowed by the trial court in rebuttal to then go into opinions and conclusions on that issue. Because she'd already ruled that I wasn't going to be able to do that. Well, she already ruled that the other side's case was changed when they didn't ask any opinion questions. Well, I understand. But I didn't look at it in hindsight. I mean, that's hindsight in this situation, Your Honor, that I'm now to anticipate that the judge is going to let me call as a witness in rebuttal somebody I didn't disclose under 213 to now elicit opinions that he wouldn't let me elicit in cross-examination. Boy, that would be a terrible attorney in that situation. That's what I was doing then. But Judge, we also have admissions from Dr. Perusin, who runs this program. He says if Ms. Cordero would testify that she observed redness at the IV site and Ms. Hardy told her that she was experiencing burning at the start of the Adria Myosin administration, he would expect Ms. Cordero, based on those two objective signs, to stop the administration of Adria Myosin pursuant to Exhibit 56. His answer was unequivocally, if you have two, as you are just, the two as you just mentioned are true, absolute, that's an admission of a party of points. He is medical arts. He is the person in charge of medical arts and administering the oncology program for that. In that situation, we believe we have an admission of a party of point on this issue, and that in this situation, a directed verdict should have been granted. Is that the standard of care? Sure. He's not allowed to testify to the standard of care. But he's allowed to testify as to what the protocol is that he set up, Your Honor, as evidence of what is the standard of care. He's the person who established this protocol, and therefore he's allowed to testify now. What exception under Sullivan are you going to? Do you have an exception to the Sullivan case? No, I'm saying that is a Sullivan case. That's what Sullivan says. That's the protocol of policy that's admissible as evidence of the standard of care. And that's under the Darling case, not under the Sullivan case. No, I'm agreeing with you that he isn't called to testify as to the nursing standard, and whether there was a breach of the nursing standard of care. That's the Sullivan case. That's the Sullivan case. But under Darling, he can say what is the policy and procedure here. All right, thank you. Mr. Trimley? Good morning. May it please the court, counsel? The court has covered much of the ground that I was planning on covering with Mr. Fewiger and your questions of him, and so I will try to not cover a lot of that ground and give opportunity for you to ask me questions that I'm sure you would like to ask me, as you did Mr. Fewiger. I do want to start with a comment made in a plaintiff's reply brief that the defense used, and this is their word, an excuse that this was an expedited trial. And I take umbrage with that because, first of all, we never offered it as an excuse. There's nothing to excuse. This case got tried, a medical malpractice case, got tried in eight months, which I think is admirable. And a review of the record, a fair review of the record, shows that while we tried to get discovered moving earlier, we were unable to depose the plaintiffs until September, a month before trial. And whose motion was it expedited? Mr. Fewiger. As Clyde was saying, in her 70s, and I think the rule in the title seemed to have expedited trial. And so we did our best to get this case moving. However, the reason I bring this up is, it's not an excuse. It's merely another fact in this case, a fact that we all had to deal with. And if there were some things that happened close to trial, it's because of the circumstances and the facts of the case, not because anybody was delaying or abusing the rules. And like so many of the facts in this case that you've heard Mr. Fewiger discuss and have read in the briefs, when the facts work against the plaintiff, the plaintiff's attorney will either discount, ignore, or misstate them. And that's just another one. We didn't offer it as an excuse, simply to help this court understand why if things happened close to trial, they happened close to trial. You know, the other comment that was made in the reply brief was that the defense used as a mantra, this issue of clinical judgment. Well, as this court well knows, the vast majority of medical negligence cases are all about clinical judgment. It's not a mantra. These cases are, by their very nature, retrospective. And they're about clinical judgment. Now, I want to address something that Mr. Fewiger said repeatedly about these Americans. It's the Oncology Nursing Society Guidelines and Recommendations that he says established the standard of care. Well, I would submit to you, your honors, that these are called recommendations and guidelines because that's what they are. And I think a fair reading of the testimony in this case indicates both Ms. Klotz and certainly Nurse Cordero explained why clinical judgment is and remains a crucial part of a case like this. This is a nursing or clinical judgment case. So what is the standard of care? To act reasonably under the same or similar circumstances. And that's why I submit to you, your honors, that the jury was entitled to accept Nurse Cordero's testimony because she was the only one who testified as an opinion witness in this case who was there. She did testify as an opinion witness? She did. But first of all, since we're on that issue, my Rule 213 disclosure, which came shortly after we finally got to depose their expert, Nurse Klotz, designated Dr. Peruchin and Nurse Rashke as controlled experts because Rule 13F says a controlled expert witness is a witness who's going to give expert testimony, not opinion testimony, expert testimony, and is either an employee or a current employee of a defendant, a partner. Well, medical arts was my client as well. Dr. Peruchin and Nurse Rashke were employees of medical arts and worked with my client, Nurse Cordero. If I hadn't disclosed them as controlled witnesses under the rule, I'd have violated the rule for not calling them controlled. But my 213 disclosure specifically identified them as being witnesses who will give expert testimony consistent with their depositions and medical records. And Rule 213G specifically says as long as I don't go beyond the deposition testimony as a part of my disclosure, that's a legitimate disclosure. It's a complete disclosure under the rule. Now, with Nurse Cordero, defendant Cordero, I specifically said, and she's going to testify, she was not negligent. I identified her as an opinion witness. But I said it would be consistent with her deposition testimony. And once again, I think a review of the record will show I very carefully adhered to the parameters of those depositions and questions I asked. And I think one of your honors pointed out to Mr. Feuliger that I did not ask Nurse Rashke or Dr. Peruchin any opinion questions because they were not tendered as opinion witnesses, but they did give medical expert testimony. So under the rule, that was my obligation. You said that Nurse Cordero was called as an occurrence witness. I said occurrence, I misspoke. Opinion. Occurrence and opinion. That was my error, your honor. And again, it couldn't have come as a surprise. I would submit to the court all of the case law talks about Rule 213. And you know, 213 can be used in so many different ways. And trial lawyers struggle with it constantly. And there's narrow interpretations and there's liberal interpretations. But the purpose of it is to avoid trial by ambush. Like its predecessor, Rule 222, we're not supposed to do trial by ambush to avoid gamesmanship and surprise. But I would ask this court to review the record and see whether there was any surprise or ambush to Mr. Feuliger or his client by having Nurse Cordero defend herself. We filed an answer denying liability. We submitted the 213 once we had a chance to depose her, their expert. And the statement of the was denying liability. I would ask the court where is the surprise? Now, if you want to talk about gamesmanship, Mr. Feuliger wants first of all to say, I didn't properly disclose these witnesses under 213. Then he wants to say, but I want to make them 213 opinion witnesses. There's the surprise. He never disclosed to me he was going to ask for opinion witnesses. I kept my questioning specifically within the parameters of the depositions as the rule required me to do. He then tried to go inside that and Judge Blackwood felt that was inappropriate. He could have very easily submitted the 213. And I don't like to get into this paper chase thing as long as I know what's going on. But he could have easily submitted the document saying, I'm going to ask Nurse Rashke standard of care questions. So at least I would have been prepared. First time I knew he was going to do that was when he started going into it on cross-examination, which I thought was both beyond the scope and beyond my disclosure. And that's why we are where we are on that case. He doesn't believe you asked your defendant expert, opinion expert, the question properly. Well, first of all, I would suggest that's a semantic distinction when he says your standard of care. That word your is obviously vague. And perhaps it was an inarticulate phrase. And I would suggest the case law says you don't have to ask the question in a particular way as long as the meaning is conveyed. And I think your standard of care, if you notice the quote that Mr. standard of care is a reasonably careful oncology nurse, the essential elements, the jury got it. The jury got instructed on what the standard of care is. I think my question, while perhaps could have been more artfully and specifically phrased, conveyed the meaning that it was intended to convey. Nurse Cordera, do you believe you violated the standard of care in your treatment of Marilyn Hardy? And she said no. And I think that there's plenty of support for the proposition that that question was adequate and sufficient under the circumstances. And obviously the jury didn't have any difficulty accepting that. I'll try not to repeat myself too much, your honors. I will point out that, again, if the record is reviewed, you will see that Mr. Fiewiger called Nurse Cordero as an adverse witness. And the first questions about standard of care asked of her were asked by Mr. Fiewiger. So I would suggest to you that the record suggests that that door was opened up whether I had disclosed her as an opinion witness or not. Was Ms. Cordero actually tendered to the court as an expert? I heard the court ask Mr. Fiewiger that. And I'll be quite candid with you, your honor. I'm not sure what that means. She was disclosed as such. I think it was made clear in the pre-trial conference that she'd be testifying on her own behalf. But as far as tendered formally, I suppose there's an argument that that was not done. And I will again confess I'm not exactly sure what the technicalities for tendering an expert would be. You identified her as a 213 opinion witness. Correct. And did say that she was not only going to testify consistently with her deposition on the records, but also going to deny that she was negligent. And that's the difference between the disclosure of her and Nurse Ratchfield and Dr. Poobsch. And I won't go over it. You already asked the questions about Sullivan and Dr. Poobsch. And that was one reason I didn't tender him as an opinion witness, because I didn't think he was qualified to comment on the issues, which I think are clearly nursing standard of care issues in this case. I would comment just very briefly if I have still a little more time. Mr. Fiewiger talks a lot about the facts. And the Nurse Cluff's testimony was uncontradictory. Well, I think the court's seeing that Nurse Cordero contradicted it pretty substantially. And if you look at the record, you'll see that Nurse Cordero was actually more qualified. Not only was she there with this patient, but she has more experience with the administration of adrenomycin, extravasation, and patient care in an oncology context than Nurse Cluff's did. Nurse Cluff cites to the nursing society's guidelines and recommendations, but she's not even a member of that organization. Nurse Cordero's not only a member, she was on the board of that organization. I bring this up only because this case still comes down to the facts. It's a question of facts. And juries are impaneled to decide facts. And this jury decided those facts. They were properly instructed on the law. And I understand that Mr. Hewitter's client is dissatisfied and unhappy, but that doesn't mean there was any error committed here. And substantially damaged. And I want to bring this point up. In retrospect, we are not denying there was an extravasation, but she had substantial injury to her arm. No one ever denied that from the opening statement until the closing documents. That is true. But I still maintain that the facts support the proposition that under the circumstances of this case, it was not an unreasonable verdict for the jury to find in favor of Nurse Cordero. I don't need to tell the court the law, but I would point out that in the case of Barth v. State Farm Fire and Casualty Company, the proposition that's in Illinois Supreme Court, page 2008, does say to reverse a jury verdict, we, meaning the appellate court, must find that it is unreasonable, arbitrary, and not based on the evidence or the opposite conclusion is readily apparent. The jury is free to accept some evidence and reject others, as well as to determine the credibility of witnesses and weigh their testimony. I suggest to this court that's exactly what happened in this case. This jury took its job seriously, considered the facts, listened to the laws the judge instructed them, and came to a proper decision. One other very quick thing. There's an issue in this case about whether we violated the motion of eliminating comparative negligence by having Nurse Cordero talk about Ms. Cordero's complaints during the administration. And I think the record will show very clearly that I limited my questions to showing how that information impacted Nurse Cordero's decision making process or clinical judgment. I never suggested at any time in the case that Ms. Hardy was comparatively at fault in this case. He also suggested in his reply brief that somehow we didn't respond to the issue of Nurse Rashke. I would ask the court to look at my brief on page four, where I spent a considerable amount of time talking about that issue. So to suggest we've somehow waived our position on that by not responding to it, I believe is inadequate. And I thank the court very much, and ask if there's any more questions. Are there any? Thank you, Mr. Truman. Mr. Feenwaker? I got it. Do you believe that as of that date, based on that information, you violated your standard of care as an oncologist? That's the question. Mr. Truman added the words, as a reasonable oncology nurse in this area. That wasn't presented to this opinion witness, and that's why we have this issue in this case. If you're going to tender an opinion witness on the standard of care, you gotta show first what is the standard of care, and whether two, you complied reasonably with the standard of care. Ms. Cordero said, yeah, I saw redness and I saw swelling, but I didn't stop. She never did render an opinion in this case that, based on my objective visualization of the patient, what she told me that day about it not burning so bad, that I complied with the standard of care that a reasonable nurse practicing in this area would do when faced with this problem. We put into evidence, however, that she breached the standard of care based on the fact that there were two objective signs, namely the redness and the swelling, and that she complained of burning on five different occasions. That's not rebutted. The standard is, in a medical malpractice case, again, to establish the duty, establish the breach from the plaintiff's standpoint, and then establish injury. There's no dispute of the injury. There's no dispute that the duty exists to stop it if there's an objective sign of extravasation. We put forward the positive, namely that there are objective signs of extravasation. Redness, burning. And my expert witness testified that it is the standard of care for a reasonable oncology nurse that, when confronted with those two objective signs, you stop. Nurse Rasky, although an occurrence witness told Ms. Cordero to stop, Dr. Perubson said, when I questioned him as to whether those were there, you expect her to follow your protocol. Yes. All of those are contrary to what Nurse Cordero obviously says, but Ms. Cordero never said that the reasonable oncology nurse practicing in this area can ignore those objective signs of extravasation. Well, didn't she say there's redness, and then there's redness? In other words, every time you stick somebody with a needle, you're going to get some redness. Right, but you're not going to get burning. And she said, I thought this was the needle stick kind of redness, not the extravasation. That it increased from a typical pinky size to a nickel size, and you also have burning, Your Honor. You can't ignore... I mean, she wants to explain it away by breaking it down from one to the other. I understand. I'm just saying, isn't it? But that was her testimony, correct? I know, but she didn't say in her testimony, it's my opinion, as a reasonable oncology nurse, that the standard of care, when confronted with redness, with an atrium myosin administration, allows me to continue onward. Let me ask you, on the issue regarding whether your client said, gee, I don't want a port, or I don't want to stop. Didn't you ask your client questions about that? I didn't ask her about, gee, my daughter said, I ought to have a port because I got small veins. Didn't you cover that? Well, I didn't. That didn't have anything to do with, later on, when they're saying, no, go ahead, it's okay, I want to get this done. Well, whether or not, if she had a port, she wouldn't have had a needle, right? So you don't think those are related? Correct. They're totally different. Then what was the significance of the test asking her about having a port? Why did you go down that road if it wasn't relevant to that? Well, because it was relevant as to the fact that this was a volunteer process, your honor. That they didn't have to go... This lady wasn't in any threat of treatment because of delaying it. And so the port... Referring to the port was simply more evidence that she couldn't... The nurse could have said, hey, why go forward with this? Let's just stop this, this day, and go put a needle in her. Counselor, that's one minute. All right. As to the argument regarding Dr. Peruzza not rendering any opinions, he did render an opinion in this case. He rendered an opinion over my objection in New England A&M Trials about the fact that Ms. Cordero, or excuse me, Ms. Hardy refused to go to physical therapy. And that, therefore, that could be a sign that she suffered more damage because she didn't undergo the physical therapy. That opinion wasn't disclosed. While it did say she declined to go for physical therapy in the medical record, Dr. Peruzza was allowed to testify as an expert, but that could have alleviated some of the problems she was having with function. So again, that wasn't a general defense for her, right? Correct. Okay. So we don't... That... Any error there would go to damages, right? Correct. Thank you, Your Honor. Thank you, Mr. Fulwiger. We thank both of you for your arguments this morning. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will now stand